**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| LAUTZENHISER TECHNOLOGIES, LLC, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|   **vs.** | )  **Case No. 4:07-cv-0084-TWP-WGH** |
| | ) |
| SUNRISE MEDICAL HHG, INC., et. al. | ) |
| | ) |
|     **Defendants.** | ) |
| | ) |

### ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' Cross-Motions for Summary Judgment

[Dkt. 154 and Dkt. 158]. Plaintiff Lautzenhiser Technologies, LLC ("LT") has brought suit for

patent infringement against (1) Sunrise Medical HHG, Inc. *doing business as* Quickie Designs

Inc. and Sunrise Medical Inc. (collectively, "Sunrise"); (2) PG Drives Technology, Inc. ("PG");

and (3) Delphi Medical Systems Corporation ("Delphi"). Collectively, Sunrise, PG, and Delphi

are the Defendants ("Defendants") in this matter.

In its Second Amended Complaint, LT charges Defendants with infringement of five

patents, all of which are directed to electronic features of power wheelchair controllers. Sunrise,

which makes and sells power wheelchairs, is charged with direct infringement. PG and Delphi

are charged with indirect infringement by virtue of supplying controllers for Sunrise's power

wheelchairs that allegedly induce or contribute to Sunrise's direct infringement. LT seeks

injunctive relief to prevent Defendants from continuing to infringe the patents-in-suit and

recovery of monetary damages resulting from Defendants' past infringement.

To varying degrees, the parties' Motions for Summary Judgment all relate to LT's

alleged *delay* in bringing suit against Defendants. Defendants' Motion for Summary Judgment

contends that LT's claims against all Defendants under all five patents-in-suit are barred by the defenses of laches, equitable estoppel, and implied license/permissive use. LT's Cross-Motion for Partial Summary Judgment, by contrast, is more limited. LT specifically seeks summary judgment on (1) the implied license/permissive use defense as to all Defendants; and (2) the laches and estoppel defenses, but only as to (I) Delphi and (ii) Sunrise wheelchairs sold with Delphi controllers (not PG or Sunrise wheelchairs sold with PG controllers). For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Likewise, LT's Motion for Partial Summary Judgment is **GRANTED** in part and **DENIED** in part.

## I.  BACKGROUND

### A.    The Patents & The Lawsuit

The patents-in-suit are: (1) U.S. Pat. No. 4,906,906 (the "'906 Patent") entitled "Conveyance With Electronic Control for Left and Right Motors," which was issued March 6, 1990, and relates to "dynamic braking"; (2) U.S. Pat. No. 4,978,899 (the "'899 Patent") entitled "Conveyance With Electronic Controls for Motors," which was issued December 18, 1990, and relates to "free wheeling" in conjunction with dynamic braking; (3) U.S. Pat. No. 5,635,807 (the "'807 Patent") entitled "Electronic Controls For Linear and Rotary Actuators," which was issued June 3, 1997, and relates to a "head array" alternative input device using an "X-type" controller; (4) U.S. Pat. No. 6,426,600 (the "'600 Patent") entitled "Proportional Actuator Control Of Apparatus," which was issued July 30, 2002, and relates to the "head array" alternative input device; and (5) U.S. Pat. No. 5,270,624 (the "'624 Patent") entitled "Apparatus and Method For

Enhancing Torque Of Power Wheelchair," which was issued December 14, 1993 (collectively, the "patents-in-suit").

All of the patents-in-suit were invented by the prolific brotherly duo, John Lautzenhiser ("John") and Lloyd Lautzenhiser ("Lloyd") (collectively, "the Lautzenhisers"). John is the sole inventor on the '807 and '624 patents. John and Lloyd are the co-inventors of the '906, '899, and '600 patents. LT was formed in 2007 and currently holds all patents-in-suit. The Lautzenhisers assigned the '906, '899, '624, and '807 patents to LT in May/June 2007. Magitek.com ("Magitek"), a company founded by John in 1998, held the '600 patent until May 2007. At that time, Magitek assigned the '600 patent to LT. The current members of LT are John, Lloyd, their brother Gary, and John's son Stephan.

Soon after the receiving all of the patents-in-suit, LT filed its original complaint June 18, 2007, charging Sunrise alone with infringement of the '906, '899, '807, and '600 patents. LT's First Amended Complaint was filed March 26, 2008, adding a claim against Sunrise for infringement of the '624 patent. Finally, LT filed its Second Amended Complaint July 11, 2008, adding two co-Defendants: (I) PG, one of Sunrise's longtime controller suppliers, and (ii) Delphi, which began supplying Sunrise with controllers in 2005.

**B.      The Genesis of the Lautzenhiser/PG & Lautzenhiser/Sunrise Relationships**

In 1997, the Lautzenhisers were developing a prototype head control device for a powered

wheelchair that could serve as an alternative to a joystick and work with a motor controller to allow a user to control a wheelchair through head movement ("head control device"). By May 1997, John and PG had discussed the prospect of collaborating on the nascent head control

device.  John clearly had high hopes for the product.  For instance, in a letter John faxed to PG, he wrote:

> If you knew the entire scope of the additional attention and prestige your company would enjoy (orders) as a result of us working together releasing never before seen technology, it would boggle the mind.  At shows, packed booths – plugged aisles.

On multiple occasions in 1997, John spoke with PG's John Camp about interfacing the head control device with PG's controllers.

Similarly, at a trade show in October 1997, John approached Sunrise's Senior Project Manager, Mark Greig, and sought Sunrise's participation in commercializing the head control device.  Sunrise indicated that it would be interested.  Additionally, at the trade show, John asked for a controller used on Sunrise's power wheelchairs.  On October 13, 1997, Mr. Greig sent John a fax, stating:

> Further to our conversation, I will send you one of our controllers for evaluation purposes.  Also, you mentioned that you would send to my attention any technical information (patents, photos, videos) for our evaluation.  The device you demonstrated John is of interest to us.  As such, if the technology proves viable for our purposes, I can forsee the possibility of working with your company to commercialize it.  In doing so, we would prefer an exclusive arrangement with you.

Two days later, October 15, 1997, John responded with a letter enclosing, among other materials, a copy of the '807 patent and the cover page of the '624 patent.  That same day, Sunrise sent John a PG controller free of charge.  Two days later, on October 17, 1997, Sunrise sent John, free of charge, a joystick, a battery box wiring harness, and a remote box with an arm that could interface with the PG controller.

Sunrise's and PG's willingness  to collaborate with the Lautzenhisers was not borne out

4

of altruism. From a business standpoint, PG and Sunrise had incentives to make their products compatible with alternative input devices like the head control device. Doing so would give them a competitive edge by allowing them to serve specific customer niches, thereby expanding markets, revenues, and profits.

**C.     Summer-Winter 1997: Suspicions of Infringement**

In 1997, John began to investigate PG's controllers, partially due to "curiosity of infringement." Specifically, on July 14, 1997, John drafted a handwritten document purportedly memorializing his infringement suspicions. The document mentions Invacare (a wheelchair manufacturer) and states, "Our patent must be violated." On the second page of the document, it states, "[PG] uses this fet driver part # IR 2110[.] See our claims 5,6 [of the '906 patent]." A separate document, which John drafted on the same day, states, "our patent must be violated to do regen [sic] [i.e. dynamic] braking" and "Attack [PG] vs. Invacare initially[.] Dog vs. Bear." Defendants intimate that the latter analogy, albeit cryptic, signifies the birth of the Lautzenhisers' litigation strategy because John was weighing the relative strength of Invacare and PG: He would rather fight a dog (PG) than a bear (Invacare). John conceded that he wrote these statements. However, at his deposition, John offered non-committal answers when pressed on the precise meaning of these words. Finally, John collected 1997 Sunrise brochures and noted on one of the brochures that PG controllers "have [brake] release for free wheeling."

On October 27, 1997 – soon after receiving the controller from Sunrise – John exchanged faxes with Kevin Duncan ("Duncan") regarding a meeting. Duncan, then an attorney at Baker & Daniels, is LT's present counsel in this dispute. A claim of attorney-client privilege has since been asserted regarding the details of this meeting. Between October 28, 1997 and

November 17, 1997, John had at least five other communications with lawyers at Baker & Daniels regarding "patent issues," "patent research," and "patent reviews." Claims of attorney-client privilege or work product have been asserted regarding the details of these communications.

In late November 1997, John's infringement suspicions grew after he transported several controllers and joysticks, including those manufactured by PG and used by Sunrise, to Canada for testing at Emhiser Research, a company owned by Lloyd. In his deposition, Lloyd conceded that Emhiser Research had the resources to test for infringement. On this point, an excerpt of Lloyd's deposition testimony is worth noting:

Q: Okay. And did you then tell your brother, 'Hey, it's . . . time to go do some testing and find out if they're really infringing.'

A: That would have been obvious from both sides. I don't specifically remember telling him, but, again, it was obvious.

On November 27, 1997, John tested three different PG controllers. The tests encompassed, among other things, "dynamic braking" and "free wheeling." Although Lloyd was not present for the testing, he testified that John's testing related to dynamic braking and free wheeling. Later, Lloyd testified that it "[i]t appeared there was some infringement" of the '899 and '906 patents. Ultimately, John sent the November 1997 test results to Duncan.

On December 10, 1997, John and his brother Gary Lautzenhiser met with counsel Duncan and John Hoffman. Prior to the meeting, John created a list of "Items for Discussion," which included "Test results regarding both patents." John has since confirmed that "both

patents" referred to the '906 and '899 patents.[1]

**D.      1997-2000: Infringement Concerns Notwithstanding, the Lautzenhisers Continue Cultivating Relationships with PG & Sunrise**

The Lautzenhisers did not sever their relationship with PG and Sunrise following the November 1997 test results.  Instead, the parties' relationships continued to grow.  Throughout 1998 to 2000, the parties met on numerous occasions regarding the commercialization of the head control device.  And, by 2000, Magitek's website contained a seven-page instruction manual on how to use and connect the Magitek head control device with specific PG controllers.

**E.      The Opening Salvo: The Lautzenhisers Threaten Patent Litigation in Late 2000**

The comity among the parties temporarily evaporated in 2000.  On September 28, 2000, Duncan sent letters to Sunrise's then-President, Michael Hammes, and then-General Counsel, Steven Jaye, stating that he represented the owner of the '906 and '899 patents and enclosed the patents for "careful review and potential licensing."  Duncan noted that these patents cover dynamic braking and free-wheeling, and urged Sunrise to take a license: "We believe that . . . a license would relate to and cover your company's offerings in the mobility industry, including powered wheelchairs and scooter products."  Finally, the letter ended by raising the specter of an infringement lawsuit: "Please be aware that the patent laws cover direct and contributory infringement as well as inducement to infringe and provide enhanced damages in the case of willful conduct."  The letter did not reference the '807 or '624 patents.

On December 22, 2000, Duncan sent a follow-up letter to Sunrise demanding a response

---

[1]In its brief, LT highlights that the 1997 inspections did not uncover results that would allow them to infer infringement with *reasonable certainty*.  In 2004, however, the Lautzenhisers verified that the PG controller used current reversal.  According to LT, this fact established infringement with reasonable certainty.

to his previous letter.  In addition to reiterating the legal consequences of infringement, in terms of tone, this letter upped the ante.  Duncan wrote that Sunrise was expressing "an apparent disregard for [the Lautzenhisers'] patent rights" and asked Sunrise to advise him whether it would retain counsel.  Duncan ended the letter by proposing a meeting to discuss potential licensing terms.

**F.     Early 2001: Sunrise & PG Respond; Hamish Bell Enters the Scrum; Crickets Chirp**

In 2001, both Sunrise and PG responded to Duncan.  Sunrise responded on January 2, 2001, through Oliver Todd, one of its outside patent attorneys.  In a letter, Mr. Todd promised that his firm would promptly review the operative issues and asked Duncan to specify the Sunrise products of potential concern.  On February 2, 2001, Duncan responded that "all products employing dynamic braking, including 'regenerative' braking, and free wheeling are worthy of examination."

PG's patent attorney, Joe Price, responded to the letters on behalf of PG and its customers.  On February 22, 2001, Mr. Price wrote Duncan:

> It has recently come to our attention that there has been an allegation of infringement of the products of certain [PG] clients that incorporate our motor control products. We have been requested to investigate your allegations of infringement . . . [I]t would be helpful if you could correspondingly identify the infringing features that you contend are present in the [PG] control systems for each of your patents.

In the meantime, on February 19, 2001, Hamish Bell ("Bell") of Rosstrom, Inc. – the North American sales agent for Dynamic Controls, a major international manufacturer of motor controllers Sunrise used in the early 1990's – had sent a letter to Duncan stating that he had been asked by wheelchair manufacturers to comment on the '899 and '906 patents.  In this letter, Bell cited several prior art wheelchairs and listed several companies, including PG, that used dynamic

8

braking prior to the advent of the '906 patent. Bell concluded, "Your diligent review of all this material will, I am sure, support my contention that the ['906 and '899 patents] cannot be valid in light of this extensive prior art now documented." Sunrise received a copy of Bell's letter.

Notably, neither Mr. Price nor Bell ever received a response to their February 2001 letters. According to LT, however, John reacted to Bell's letter by setting off on a painstaking search for the prior art, even displaying "Wanted" posters for the prior art at trade shows. John's considerable efforts are detailed in his Declaration. [Dkt. 178]. Further, LT emphasizes that the Lautzenhisers' ability to locate the prior art was hobbled by John's serious health problems, which are also detailed in his Declaration.

In any event, after some slight saber-rattling by the Lautzenhisers in 2000 and 2001, all was quiet on the litigation front until 2007.

**G.      2001-2007: PG & Sunrise Allegedly Rely on the Lautzenhisers' Silence as to Infringement & Continue Working Together**

Apparently, the litigation skirmish did not badly fray the parties' relations. Throughout the decade, PG, Sunrise, and the Lautzenhisers continued to court each other in hopes of developing a mutually beneficial relationship.

According to PG's Managing Director, Hal Chenhall, the Lautzenhisers' silence as to infringement was meaningful because it fostered reliance. In relevant part, Mr. Chenhall testified:

> [W]e continued to supply our controllers to our customers, and we continued to develop our products believing that the allegations had been dropped. If we'd had a response to [Mr. Price's] letter which gave us some clarification of where we were alleged to infringe . . . we would have done a design-round.

Indeed, in the past decade, PG spent roughly $47 million developing and marketing its controllers. PG also worked cooperatively with Magitek and the Lautzenhisers. Significantly, in

2002 and 2003, PG modified its products to make them more compatible with the Magitek head control device.  On this point, Mr. Chenhall testified that the evolution of PG's relationship with the Lautzenhisers and Magitek only fortified reliance: "[T]he continuing general ongoing working with the Lautzenhisers and Magitek . . . over the years just reinforced that impression that the whole thing [i.e. the threat of litigation] had gone away."  Perhaps it was the elephant in the room, but neither the Lautzenhisers nor Magitek ever mentioned infringement concerns to PG during this time period.

According to Sunrise, it also had grounds to rely on the Lautzenhisers' silence as to infringement.  In October 2001 – roughly 8 months after the Price and Bell letters – Greig, Sunrise's Senior Project Manager, met with the Lautzenhisers and loaned them a power wheelchair to demonstrate their head control device.  Similarly, in September 2002, Steve Lautzenhiser called Greig to request a power wheelchair in anticipation of a trade show so that the Lautzenhisers could demonstrate the interoperability between the head control device and Sunrise's wheelchairs.  Greig complied with this request, giving the Lautzenhisers a Sunrise wheelchair (worth $16,030) free of charge.  In 2004, Ted Gillespie, Sunrise's outside patent counsel, called John for assistance with an unrelated patent issue.  John assisted, and never intimated that Sunrise's wheelchairs were infringing.  Finally, like PG, during the course of the Lautzenhisers' silence as to infringement, Sunrise poured considerable financial resources into the development of controllers.

**H.      Sunrise's Pursuit of a Proprietary Controller & Its Venture with Delphi**

For purposes of the present dispute, LT attempts to cast doubt on Sunrise's reliance by

emphasizing Sunrise's prior efforts to develop its own proprietary controller. Indeed, Sunrise's pursuit of a controller has been fairly long and arduous.

Expressing some concerns with PG's "engineering and customization capabilities" and looking to augment its own design capacity, Sunrise purchased Dynavox in 1998, devoting an eight person team to developing its own controller. When this venture foundered, Sunrise embarked on a separate quest for controller development with Curtis Instruments (dubbed the "Deep Blue Sea" project), which began in 2001 just months after the Lautzenhisers first notified Sunrise about the possibility of taking a license for the '899 and '906 patents. Sunrise spent three years and $500,000 developing a controller with Curtis.

Subsequently, Sunrise shifted gears, entering into another controller development venture, this time with Delphi. The relationship between Sunrise and Delphi began in 2003, and the two entered into a formal contract in February 2004. At the outset, Sunrise provided to Delphi a list of some 150 industry patents of interest, including the patents-in-suit. Nevertheless, the evidence suggests that the design of Delphi's controllers was not affected one iota by the existence of the Lautzenhisers' patents. Delphi's 30(b)(6) witness testified that it "had no knowledge of the Lautzenhiser patents during the design phase; so therefore we wouldn't have made any design changes in consideration of the Lautzenhiser patents." Delphi's 30(b)(6) witness also testified that controller was essentially made from scratch and was different than any other controller on the market. Finally, Delphi testified that at the time it began developing the controller, it had existing resources going unused due to the automotive slowdown. In 2005, Delphi began delivering its controllers for commercial use in powered wheelchairs. Together, Sunrise and Delphi have spent more than $50 million to launch new controllers in the United

States and Europe.

Beginning in mid-2006, John worked with Sunrise (and Delphi indirectly) to make the head control device and Delphi controllers interoperable. During the course of this work, John became familiar with the Delphi motor controller. Specifically, on April 27, 2007, John thanked Wayne Gullett at Sunrise via email for Sunrise's technical support, but also expressed concerns regarding "the complexities involved when trying to use the Magitek drive control with the Delphi system." John closed his email on an upbeat note: "I hope we will all have a payoff soon." Apparently, however, this optimism was short-lived. Less than two months later, on June 18, 2007, LT filed its original complaint against Sunrise.

The Court adds additional facts below as needed.


## II. LEGAL STANDARD

Like any other case, summary judgment is appropriate in a patent case when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994). When an alleged infringer moves for summary judgment on laches and estoppel grounds, there must be no genuine issue of material fact; the burden of proof on each issue must be correctly allocated; and all pertinent equitable factors must be considered. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992)(*en banc*).

The party moving for summary judgment bears the burden of demonstrating that no genuine issues of material fact exist. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Meyers v. Asics Corp.*, 974 F2d 1304, 1307 (Fed. Cir. 1992). The movant also bears the

responsibility of informing the court of the basis for the motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials, but instead must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id*. Finally, "On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions submitted] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

### III.  DISCUSSION

To reiterate, to some degree, the parties' Cross-Motions for Summary Judgment all relate to LT's alleged *delay* in bringing suit against Defendants.  Defendants' Motion for Summary Judgment contends that LT's claims against all Defendants under all five patents-in-suit are barred by the defenses of laches, equitable estoppel, and implied license/permissive use.  LT's Cross-Motion for Partial Summary Judgment is narrower, seeking summary judgment on (1) the implied license/permissive use defense as to all Defendants; and (2) the laches and estoppel defenses, but only as to (I) Delphi and (ii) Sunrise wheelchairs sold with Delphi controllers (not PG or Sunrise wheelchairs sold with PG controllers).  For each respective Motion for Summary Judgment, the Court will draw reasonable inferences and view the record in the light most favorable to the non-moving party.

**A.      Defendants' Laches Defense**

*1.      <u>General Principles & Analytical Framework</u>*

The general principles of a laches defense were spelled out in the Federal Circuit's seminal *en banc* decision *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed Cir. 1992).

In the legal context, "laches may be defined as the neglect or delay in brining suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Id*. at 1028-29 (citation omitted).  At its core, the laches defense relates to whether the "patentee dealt unfairly with the alleged infringer by not promptly bringing suit." *Id*. at 1034.  Laches does not demand fealty to mechanical rules, but instead requires the Court to look at all of the particular facts and circumstances and to weigh the equities of the parties. *Id*.

To invoke the laches defense, a defendant has the burden of proving two factors: (1) the plaintiff delayed filing suit for an <u>unreasonable and inexcusable length of time</u>; and (2) the delay operated to the <u>prejudice or injury of the defendant</u>. *Id*. at 1032 (emphasis added).  If these factors are proven, laches bars the recovery of patent damages for any time period before the suit was filed. *Id*. at 1028.  For purposes of laches, the clock starts to run at "the time the plaintiff <u>knew or reasonably should have known </u>of its claim against the defendant." *Id*. at 1032 (emphasis added).

As to factor (1), the length of time that may be deemed unreasonable has no fixed boundaries, but depends on specific circumstances. *Id*.  Thus, a court must consider and weigh any justification by the plaintiff for delay, including excuses such as: (I) other litigation; (ii)

negotiations with the accused infringer; (iii) possible poverty and illness; (iv) wartime conditions; (v) the extent of infringement; and (vi) a dispute over ownership of the patent. *Id*. at 1033.

As to factor (2), material prejudice to a defendant resulting from the patentee's delay may take the form of "economic" or "evidentiary" prejudice. *Id*. at 1033. Economic prejudice may arise where a defendant will suffer the loss of monetary investments or incur damages "which likely would have been prevented by earlier suit." *Id*.  Economic prejudice is a "slippery" concept: Although it requires the alleged infringer to *change* circumstances during the period of delay, it does not allow a patentee to lie silently watching damages accrue. *Id*.  In other words, economic prejudice arises where a defendant undergoes a change in economic position during the period of delay, and there is a causal nexus between the patentee's delay and the defendant's investments. Evidentiary prejudice, on the other hand, is a simpler concept.  It exists if a defendant is unable to present a "full and fair defense" on the merits due to a loss of witnesses, records, or faded or unreliable memories of long past events, thus "undermining the court's ability to judge the facts." *Id*. at 1033.

Although laches does not have mechanical rules *per se*, a rebuttable presumption of laches does arise when a patentee delays filing suit for more than <u>six years</u> from the date it knew or should have known of the alleged infringement. *Id*. at 1035-36 (emphasis added). If this threshold duration is met, both unreasonable delay and resulting prejudice – factors (1) and (2) – are presumed proven, and the burden of production of evidence (not the burden of persuasion) shifts to the patentee, who must come forward with evidence sufficient to put the existence of the presumed facts into genuine dispute. *Id*. at 1037-38.

If the patentee meets this burden, the presumption evaporates under the "bursting bubble" theory of presumptions. *Id*. at 1037. ("[A] presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact."). When the bubble bursts, the accused infringer "is left to its proof" or "actual evidence." *Id*. at 1038. Thus, to overcome the presumption the plaintiff must offer evidence that the delay: (1) was reasonable or excusable; (2) that the defendant was not materially prejudiced; or (3) both. *Id*. At the summary judgment stage, evidence rebutting the presumption must raise a genuine issue of "either factual element of a laches defense" and in doing so "the presumption of laches is overcome." *Id*.

Where, as here, more than one patent is asserted, laches must be shown separately for each patent. *R2 Medical Systems, Inc. v. Katecho*, 931 F. Supp. 1397, 1408 (N.D. Ill. 1996) (citing *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992)). Moreover, the defense of laches is personal to each defendant asserting it. *Aukerman*, 960 F.2d at 1032. In other words, the defense of laches must be analyzed with respect to each Defendant, product, and patent at issue.

As an initial matter, pursuant to an Order issued by the United States Bankruptcy Court for the Southern District of New York, LT is allowed to bring its patent infringement claims against Delphi, but is barred from seeking damages against Delphi before July 28, 2008, the day LT served Delphi with a summons and the Second Amended Complaint. Thus, Delphi has already realized all the benefits that application of laches could provide it. After all, when a court applies the laches defense, the patent owner cannot recover from a defendant damages for infringement from any period of time before the commencement of the action against that

16

defendant. *Id*. at 1032. Therefore, Delphi's laches claim is a moot point that the Court need not analyze.

2. **The '906 & '899 Patents**

a. *Trigger Date & Applicability of Presumption*

The Court's first inquiry is the date when LT[2] knew or should have known of its claims against the Defendants. To establish "knowledge" and activate the laches clock, LT must have had "more than a mere suspicion but less than absolute assurance" of Defendants' alleged infringement. *Rockwell Int'l Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000). Employing this standard, the Court finds that LT's clock started running in late 1997 for the '899 and '906 patents.

First, it is insignificant that the Lautzenhisers and Magitek assigned the patents-in-suit to LT. It is well-settled that as to transfers of interest during a period of delay, the transferee of a patent must accept the consequences of his transferor's dilatory conduct. *See Rome Grader & Mach. Corp. v. J.D. Adams Mfg. Co.*, 135 F.2d 617, 620 (7th Cir. 1943) ("plaintiff is chargeable with the sum total of the laches of itself and of its predecessor"); *R2 Medical*, 931 F. Supp. at 1412 (where the plaintiff is a transferee of a patent, it must bear the consequences of delay by the transferor).

Second, the Court agrees with Defendants that the undisputed material facts show that LT was aware of its claims against Defendants in 1997. By 1997, the Lautzenhisers knew that Sunrise used PG controllers. In July 1997, John memorialized his suspicions of infringement in

---

[2]The Court is mindful of the fact that LT did not come into existence until 2007. However, for ease of reference, the Court may use "LT," even though the phrase "the Lautzenhisers" would be more precise.

a handwritten document. This suspicion evolved into something more concrete after the Lautzenhisers investigated and tested PG controllers used on Sunrise wheelchairs. Specifically, John completed testing on PG controllers for dynamic braking and free wheeling – the precise subject matter of the '899 and '906 patents – at a facility in Canada. The Lautzenhisers then met with patent litigators, one of whom is counsel in this case, to discuss the test results and potential infringement issues.

Presumably, by the end of 1997, LT had actual knowledge of its claims against Defendants on these two patents. If, however, LT had not yet acquired actual knowledge, the laches clock still starts running in late 1997 because, at the very least, LT had constructive knowledge by then. *See R2 Medical*, 931 F. Supp. at 1409 (a patentee is "charged with such knowledge as it might have obtained upon inquiry, provided the facts already known to it were such as to put upon a man of ordinary intelligence the duty of inquiry.") (citation and internal quotations omitted). The original complaint against Sunrise was not filed until June 2007 and PG was not added until July 2008. Thus, for both Sunrise and PG, LT delayed bringing suit for over nine years after acquiring the requisite knowledge.

LT counters that, to the contrary, genuine issues exist as to when it learned that the '899 and '906 patents were infringed for two key reasons: (I) The results of the 1997 testing were limited and inconclusive; and (ii) LT did not learn definitively about infringement of these patents until 2004 testing. The Court is not persuaded. The document that John handwrote in July coupled with the testing indicate that LT had, at the very least, constructive knowledge, if not actual knowledge, by the end of 1997. As Lloyd testified, the Canada facility was equipped with the technology to test for infringement. *See ABB Robotics*, 828 F. Supp. at 1391 (A party

"must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge."). Further, LT's claim that it did not learn definitively of infringement until 2004 is, to some degree, belied by Duncan's 2000 and 2001 letters, in which he effectively accused Sunrise and PG of infringement. Obviously, prior to 2004, LT had more than a mere inkling of infringement.

Because the delay exceeds six years, Sunrise and PG are entitled to the benefit of presumptions of unreasonable delay and prejudice, the two factual predicates for the application of laches. Thus, LT must come forward with evidence sufficient to put the existence of these presumed undisputed facts into genuine dispute, either by showing that the delay was reasonable or that the movant did not suffer prejudice caused by the wait. *Aukerman*, 960 F.2d at 1038. If it fails to do so, then Sunrise and PG will prevail. *See Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (recognizing that plaintiff must do more than attack defendant's evidence regarding unreasonableness and prejudice, because "the defendants could have remained *utterly mute* on the issue[s] . . . and nonetheless prevailed."); *ABB Robotics*, 828 F. Supp. at 1392 (defendant must put forward "evidence sufficient to support a finding of the nonexistence of the presumed fact.").

b.    *Unreasonableness of Delay*

Attempting to defeat the presumption of unreasonableness, LT argues that its 9-10 year delay in bringing suit was still reasonable because of extenuating circumstances. First, LT highlights that John experienced numerous health setbacks from 1996 to 2005, including fibromyalgia, prostate cancer that required a prostatectomy, a torn right rotator cuff that required surgery, and torn tendons in his left shoulder. Additionally, throughout much of 2004, John had

to devote considerable time to caring for his ailing wife.  Second, LT argues that its anemic

economic resources contributed to the delay.  Third, LT contends that part of the delay stems

from *other litigation* with its licensee, Global Power, Inc., that involved rights concerning

patents-in-suit.  Finally, LT argues that following Bell's letter in 2001, it set off on a long search

to locate the prior art described in Bell's letter, thus adding to the delay.

Even when viewed collectively, these considerations do not defeat the presumption of

unreasonableness.  First, with respect to John's health, John *and* Lloyd were the co-inventors on

the '899 and '906 patents.  John's health problems notwithstanding, there is no evidence to

suggest that Lloyd, also a member of LT, was unable to pursue claims against Sunrise and PG.

More importantly, John's other activities cast doubt on the validity of his health excuse.  Not

only did John maintain a busy work schedule throughout the decade, but he was also involved in

an assortment of litigation from 2000 to 2002.  He pursued litigation against Global Power

Systems in 2000, even though it was probably his most tumultuous year health-wise.  In 2001, he

was involved in a lawsuit related to the sale of unregistered securities.  In 2002, he sued a former

business advisor for failing to register stock.  And, in April 2002, he sued for injuries suffered in

a December 2000 automobile accident.  Moreover, in 2002, as evidenced by his Declaration,

John practically traveled "coast to coast" searching for the prior art mentioned in Bell's letter.

While John's health problems were certainly serious, they did not bar him from working or

litigating during the operative time period.  Finally, there is no evidence that the present lawsuit

was filed in 2007 because John's health had improved by that time.  As such, LT cannot use

John's health to create a genuine issue of material fact justifying LT's delay.

Second, LT's unsupported plea of poverty falls completely flat, discredited by John's

2002 assertion that he had "acquired a net worth of several million dollars."

Third, the Court agrees with Defendants that Global Power litigation raises no *genuine* issue of material fact. This lawsuit was incredibly brief by any standard, let alone patent litigation standards. It began in March 2000 and settled on September 15, 2000. The evidence further suggests that LT was ready to litigate immediately following the conclusion of that lawsuit; Duncan sent out his first demand letter on September 22, 2000. Finally, from a timing standpoint, this seven-month litigation is a mere blip in light of the overall 9-10 year delay. *See Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 40 (D. Mass. 1998) (holding that a two-year reexamination proceeding at the end of a thirteen-year delay has "no bearing on the preceding decade of delay.").

Fourth, the Court finds that John's quest to find the prior art mentioned in Bell's letter does not excuse a 9-10 year delay. After all, a patent holder has no obligation to search for all prior art before commencing suit because a patent is presumed valid, 35 U.S.C. § 282, and the burden is on a patent challenger to assert and prove invalidity. *See Western Elec. Co. v. Piezo Tech., Inc.*, No. 81-694-CIV-ORL-19, 1990 WL 126269, at *10 (M.D. Fla. March 22, 1990) ("[A] concern that the patent may be invalid does not, in and of itself, toll the delay for purposes of laches."). Moreover, Hamish Bell, not Defendants, induced this search for prior art. Thus, contrary to LT's suggestions, Defendants did not actually contribute to the delay. Finally, it is worth reiterating that LT never informed Defendants that it was in fact searching for prior art; instead, Price's and Bell's letters were met with mere silence.

In light of LT's failure to offer evidence creating genuine issues of material fact, the presumption of unreasonableness remains intact.

### c. *Material Prejudice*

LT also attempts to rebut the presumption of material prejudice. To bolster its claim that Defendants have not suffered evidentiary prejudice, LT argues only that "Defendants have document retention and handling systems in place and have retained all key documents. Moreover, an inspection of the documents produced during discovery and the testimony of Defendants establish that the majority of the key players are still with their respective companies." [Dkt. 182 at 31].

While perhaps a close call, the Court is not persuaded, and therefore the presumption of prejudice remains intact. To buttress its argument, LT merely pointed to the existence of document retention systems and witnesses. This, however, does little to assuage concerns regarding faded memories; nor does this fact guarantee that *all* crucial witnesses and documents remain available. On the memory point, John's 2009 deposition is illustrative. When pressed, he failed to recall any details whatsoever about what he meant in 1997 when he analogized Invacare to a bear and PG to a dog. The Court believes that LT's arguments are largely conclusory, and are therefore insufficient to overcome the presumption.

To bolster its claim that Defendants have not suffered economic prejudice, LT argues that Defendants have done nothing more than design, develop, and promote products in the ordinary course of business, which has nothing to do with LT's delay. LT specifically highlights that "none of the Defendants in this case has shown any 'curtailed design and development' of products once the lawsuit was filed" or that any of the Defendants would have "acted differently had LT sued earlier." [Dkt. 182 at 31]; *see, e.g., Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371-72 (Fed. Cir. 2001) (hiring of new employees, modification of equipment, and engagement

in sales and marketing activities related to the infringing product are "damages normally associated with a finding of infringement and do not constitute the type of damages necessary for a finding of economic prejudice"). Finally, in making this argument, LT relies heavily on *Meyers v. Asics Corp.*, 974 F.2d 1304 (Fed. Cir. 1992), in which the Federal Circuit reversed the district court's decision to grant summary judgment because conclusory allegation of prejudice did not establish prejudice from plaintiff's delay.

While this is a close call, once again, the Court is not persuaded. "In granting summary judgment to the alleged infringer on laches, courts usually have relied upon evidence of considerable capital investment or substantially increased sales." *R2 Medical,* 931 F. Supp. at 1411; *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (during delay, defendant made considerable capital investments in expanding business); *ABB Robotics*, 828 F. Supp. At 1396 (granting summary judgment where alleged infringer enjoyed three-fold increase in sales of challenged device during period of delay); *Motorola, Inc. v. CBS, Inc.*, 672 F. Supp. 1033, 1037 (N.D. Ill. 1986) (ruling that Motorola could not overcome presumption of prejudice because CBS's sales of allegedly infringing product continued and expanded while Motorola delayed in bringing suit); *Manus v. Playworld Sys., Inc.*, 893 F. Supp. 8, 10 (E.D. Pa. 1995), *aff'd*, 86 F.3d 1177 (Fed. Cir. 1996) (economic prejudice was shown with costs associated with increased production of accused article and marketing and capital expenditures over the ten-year delay in filing suit); 5 Chisum, *Patents*, § 19.05[2][c] (1996 Supp.) (noting there are very few cases when a lengthy period of unexcused delay escaped a laches finding because of proof of want of injury).

Defendants argue, "There is no genuine issue that while LT delayed in filing this action,

Defendants made enormous capital investments, including tens of millions of dollars in controller development, research and development, marketing, and sales of its power wheelchairs from 1997-2007." [Dkt. 168-1 at 29]. Specifically, PG expended considerable resources in controller development and in cooperating with the Lautzenhisers to ensure that the head control device was compatible with its controllers. Similarly, Sunrise spent time and money pursuing controller development projects and ensuring compatibility between Delphi controllers and the Magitek head control device. LT counters that Defendants's expenditures were mere garden-variety ventures in the ordinary course of business, and that no evidence suggests Defendants would have altered their conduct had LT filed suit earlier. The Court disagrees. If LT had sued earlier, Defendants likely never would have expended time and money to ensure compatibility between the controllers and the head control device. What is more, common sense suggests that Defendants would have modified their business strategies if they came under suit for infringement. On this point, the testimony of PG's Managing Director, Hal Chenhall, is telling:

> [W]e continued to supply our controllers to our customers, and we continued to develop our products believing that the allegations had been dropped. If we'd had a response to [Mr. Price's] letter which gave us some clarification of where we were alleged to infringe . . . we would have done a design-round.

Finally, the key case that LT relies upon, *Meyers v. Asics Corp*., 974 F2d 1304 (Fed. Cir. 1992), is distinguishable because in that case, the defendants' delay was only four and one-half years, and therefore they were not entitled to the six-year presumption. Here, by contrast, the Court finds that LT failed to present evidence sufficient to create a genuine issue of material fact regarding the nonexistence of the presumed material prejudice, meaning that the presumption

remains intact.

### d. *Differences Among Various Controllers*

LT makes a final argument premised on the requirement that the Court has to examine the facts surrounding each defendant's alleged laches defense on *a product-by-product basis. See Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co., Inc.*, 708 F. Supp. 1423, 1435 (D. Del. 1989). The *Intertech* court spelled out this argument in clear terms:

> [T]he delays associated with periods of infringement by different machines do not 'tack' <u>unless the nature of the alleged infringement remains substantially constant</u> throughout the relevant time periods . . . If the products sold by a defendant *within 6 years* preceding a lawsuit are not <u>functionally equivalent</u> to products sold *more than 6 years* prior to the lawsuit, then there is no reason why laches would bar a plaintiff's infringement claim as to the more recent sales (i.e. those within the last 6 years), because it is essentially a different claim of infringement.

*Id.* (citation omitted and underline added).

Based on this principle, LT argues, summary judgment on laches is inappropriate because of the differences among the various PG controllers and the PG and Delphi controllers. Specifically, LT notes that PG manufactured at least six controllers that may infringe the patents-in-suit: PG8, Pilot, Pilot Plus, VRS, VSI, and R-Net. LT claims that it lacks information to determine the similarity of these devices, and "believes that there are significant differences between the products." [Dkt. 182 at 19]. In attempt to highlight these differences, LT points to deposition testimony from Jolyon Crane, PG's Technical Director, which ostensibly describes meaningful differences in PG's various controllers. With respect to Delphi, LT maintains that because Delphi's controllers were unique, made "from scratch," and did not come to market until 2005, tacking is inappropriate. To bolster this claim, LT relies on deposition testimony from Sunrise's Senior Project Manager, Mark Greig.

The Court is not persuaded. First, Mr. Crane's testimony relates to discrete resistive elements and the use of a microcontroller; it has nothing to do with dynamic braking or free wheeling – the subject matter of the '899 and '906 patents. Mr. Greig's testimony is equally unrelated to the '899 and '906 patents. Thus, LT's claim that there are significant differences among the products for purposes of the '899 and '906 patents is relegated to mere attorney argument. Second, Defendants have put forth evidence indicating that, for purposes of the '899 and '906 patents, the various PG controllers and the PG and Delphi controllers are functional equivalents, meaning that tacking is appropriate for this succession of different products. *See Aukerman*, 960 F.2d at 1031 ("[L]aches has been viewed as a single defense to a continuing tort up to the time of suit, not a series of individual defenses which must be proved as to each act of infringement, at least with respect to *infringing acts of the same nature*.") (emphasis added).

With respect to the '906 patent, John testified in his deposition that both PG and Delphi controllers employ substantially similar infringing conduct:

> Q: Did you conclude that Sunrise was the only manufacturer that was infringing [the '906 patent]?
>
> A: I did not come to that conclusion, no.
>
> Q: Okay. Which other manufacturers did you conclude were infringing?
>
> A: All of them.
>
> Q: So every single manufacturer -- when did you make that – reach that conclusion? In 2004?
>
> A: I -- I became -- in 2004 I -- I was seeing the current reversal that I would say -- I'll qualify that, that any manufacturer using a pulse with modulated controller that was shorting the fets [sic, FETS] between power pulses and run at that frequency, that since they were all basically the design, it would be my judgment if one was, that the others were doing the same thing.

Q: That would include the -- the Delphi controller and the PG controller --

A: Yeah.

LT asserts that this testimony fails to prove functional equivalence: "Sunrise has attempted to meet its functional equivalency burden for the '906 patent by citing to John Lautzenhiser's testimony regarding what he was seeing done in 2004 with respect to current reversal, which related to a period of time before the Delphi controller was even introduced to the marketplace." [Dkt. 190 at 4]. The Court does not read this testimony that way. Rather, the testimony indicates that John became aware of an infringing feature in 2004, and that Delphi also employs this same feature – which, in the Court's view, amounts to functional equivalence.

With respect to the '899 patent, John testified that, in essence, regardless of design differences between PG and Delphi controllers, they both infringe the '899 patent because they both have a means or method to "open the circuitry" to allow "freewheeling." Finally, as LT highlights in its own brief, it is important to note that the '899 patent is a "continuation-in-part from, and therefore legally related to the '906 patent." As such, "LT agrees that the '906 and '899 patents may be considered together for purposes of the Court's preemptive determinations." [Dkt. 182 at 24, n.8].

Ultimately, the Court is convinced that despite any differences among the various controllers, LT alleges infringing acts of the same nature with regard to both the '899 and '906 patents, whether the controller is PG's or Delphi's. Thus, tacking is appropriate, meaning the laches clock started to run in late 1997 for all PG and Delphi controllers used on Sunrise wheelchairs.

For the reasons set out above, the Court **GRANTS** PG and Sunrise's Motion for

Summary Judgment on the laches defense as it applies to the '899 and '906 patents. By doing so, the Court effectively **DENIES** LT's Cross-Motion for Partial Summary Judgment on the laches defense as it applies to the '899 and '906 patents (i.e. through Sunrise wheelchairs that use Delphi controllers).

### 3. The '807 and '624 Patents

For these two patents, the Court must once again begin its laches analysis by inquiring when LT knew or should have known of its claims against the Defendants.

First, Defendants maintain that the laches clock started running in 1997 for the '624 and '807 because these patents were in existence in 1997, when John conducted testing on the PG controllers. Because the period of delay exceeds six years, Defendants argue, they are entitled to legal presumptions regarding unreasonableness and material prejudice. The Court is not persuaded, and cannot find that 1997 is the operative trigger date for these patents. As LT correctly notes, "Defendants fail to direct the court to anything in the record that gives the court the ability to ascertain a definite period of delay as needed to perform its analysis." [Dkt. 182 at 24].

Indeed, Defendants' timing evidence is scant. On October 15, 1997, John sent Mr. Greig at Sunrise a letter enclosing, among other materials, a copy of the '807 patent and the cover page of the '624 patent. However, there is no suggestion that John had knowledge of infringement at this time, or that this was any sort of veiled litigation threat. To the contrary, the correspondence between John and Mr. Greig suggests that the patents were sent primarily to enhance Sunrise's knowledge of the head control device. Moreover, in his late 2000 letters threatening an infringement suit, Duncan only mentioned the '899 and '906 patents – not the '807 and '624

28

patents. This omission is telling. If John had infringement concerns about the '807 and '624 patents at this time, presumably they would have been referenced in the letters.

Finally, Defendants argue that even if LT did not have actual knowledge of alleged infringement of the '807 and '624 patents at this time, it still had constructive knowledge via its duty of inquiry. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed. Cir. 1993) (a patentee is charged with "such knowledge as it might have obtained upon inquiry, provided the facts already known by [it] were such as to put upon a man of ordinary intelligence the duty of inquiry."). Specifically, Defendants cite *R2 Medical*, 931 F. Supp. at 1410 for the sweeping proposition that an examination of accused devices constitutes constructive knowledge of infringement claims. The Court does not read *R2 Medical* so expansively, as such a general rule would cause unfairness. *See Advanced Cardiovascular*, 988 F.2d at 1162 (there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend.) For instance, there is no indication that John's testing of PG controllers could have revealed infringement of the '807 and '624 patents.

The Court believes that under the circumstances, the more applicable principle is that where infringement is not open and notorious, it is difficult to prove that a patentee reasonably should have known of the infringement. *Compare American Optical Corp v. Pittway Corp.*, 19 USPQ2d 1789, 1791 (E.D.N.Y. 1991) (hidden nature of component would make it possible for plaintiff not to have discovered that the component was in wider use) *with Aqua Queen Mfg.*, 93 F.3d at 1553 (plaintiff should have known of infringement where it was open and notorious, and did not require dismantling and testing).

Here, there is no evidence suggesting that the infringement was open or notorious, or that LT had actual knowledge of infringement. Drawing all reasonable inferences in favor of LT, the Court simply does not have the requisite basis to pinpoint a laches trigger date for the '807 and '624 patents. *See ABB Robotics*, 828 F. Supp. at 1389 ("The question of when a patentee 'knew or should have known' is one of fact."). Without a trigger date, it would be premature for the Court to complete a laches analysis. For instance, without knowing when LT had actual or constructive knowledge, the Court cannot determine if LT's behavior was unreasonable. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995) (citing *Aukerman* for the proposition that reasonableness must be judged based on plaintiff's knowledge).[3] Therefore, PG and Sunrise's Motion for Summary Judgment is **DENIED** with respect to the laches defense on the '807 and '624 patents. For similar reasons to those described above (i.e. genuine questions of material fact regarding functional equivalence, regardless of whether PG or Delphi motor controllers is involved), LT's Cross-Motion for Summary Judgment (involving Sunrise wheelchairs with Delphi controllers) is **DENIED** as to the laches defense on the '807 and '624 patents.[4]

### 4. The '600 Patent

The earliest potential trigger for the '600 patent is July 30, 2002, the date it was issued.

_____

[3]If, by way of example, LT did not discover infringement on the '624 and '807 patents until mid-2007, Defendants obviously could not prevail on their laches defense.

[4]The '624 patent is subject to a separate Motion for Summary Judgment on a disclaimer argument. The Court has reviewed the parties briefing and has determined, at the very least, genuine issues of material fact exist regarding whether a Delphi controller is the functional equivalent of a PG controller for infringement purposes. Similarly, Defendants also created genuine issues of fact as to the functional equivalency of PG and Delphi controllers involving the '807 and '600 patent. [Dkt. 172 at 7-9].

Defendants insist that the laches clock should commence immediately, because by 2002, the Lautzenhisers had intimate familiarity with PG and Sunrise and because the '600 patent specifically relates to the head control device. In light of this trigger, Defendants contend, PG is entitled to the laches presumption because it was not added as a Defendant until the summer of 2008. Defendants concede that Sunrise, named in the original complaint in 2007, is not entitled to this presumption. Nevertheless, Sunrise claims that it is still entitled to summary judgment because, under the circumstances, the five-year delay was unreasonable and caused material prejudice.

Once again, however, the Defendants have failed to provide the Court with evidence sufficient to pinpoint a start date for purposes of laches. Thus, the Court cannot complete its laches analysis with any reasonable certainty. As such, Defendants' Motion for Summary Judgment is **DENIED** with respect to the laches defense for the '600 patent. For similar reasons to those described above (i.e. genuine questions of material fact regarding functional equivalence, regardless of whether PG or Delphi motor controllers is involved) [Dkt. 172 at 8-9], LT's Cross-Motion for Summary Judgment (involving Sunrise wheelchairs with Delphi controllers) is **DENIED** as to the laches defense on the '600 patent.


B.      **Defendants' Estoppel Defense**

Equitable estoppel may serve as an *absolute* bar to a patentee's claim of infringement. *Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998). The equitable estoppel bar applies when:

> (1) The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that patentee does not intend to enforce its patent against

the alleged infringer. 'Conduct' may include specific statements, action, inaction, or silence when there was an obligation to speak;

(2) The alleged infringer relies on that conduct; and

(3) Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with the claim.

*Aukerman*, 960 F.2d at 1028. Like laches, the defense of estoppel must be analyzed with respect to each Defendant, product, and patent at issue. Also like laches, "equitable estoppel is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *Gossen Corp. v. Marley Mouldings, Inc.*, 977 F. Supp. 1346, 1353 (E.D. Wis. 1997) In contrast to laches, "equitable estoppel focuses on the reasonableness of the Defendant's conduct." *Id.* (emphasis added). And, unlike laches, "unreasonable delay" is not an element of estoppel and no presumption applies, meaning a party advancing an estoppel defense must prove each of the elements by a preponderance of the evidence. *Id.*

Defendants contend, "The Lautzenhisers communicated by a decade of silence and misleading words and action, that the patents-in-suit would not be enforced against Defendants, who reasonably relied upon these communications in developing their business," thus causing economic and evidentiary prejudice. [Dkt. 168-1 at 24]. Predictably, LT disputes this, arguing that genuine issues of material fact abound. The Court agrees with LT. For the '899 and '906 patents, genuine issues of material fact exist as to whether PG and Sunrise relied on LT's misleading conduct. For the '600, '624, and '807, genuine issues of material fact exist as to whether LT engaged in misleading conduct.[5]

---

[5]For each patent, the Court stopped its analysis of the elements of equitable estoppel after determining that genuine issues of material fact exist. Thus, for the '899 and '906 patents, the

1.      **The '899 and '906 Patent**

   a.      *Misleading Conduct*

To prove the first element of equitable estoppel, the alleged infringer must prove that the

patentee, through misleading conduct, has led the infringer to infer that it does not intend to

enforce the patent. The patentee's misleading conduct may include specific statements, actions,

inaction, or silence. *See Gossen Corp.*, 977 F. Supp. at 1353-54 (citing *ABB Robotics*, 52 F.3d at

1063).

   The Federal Circuit has explained that:

   The patentee's conduct must have supported an inference that the
   patentee did not intend to press an infringement claim against the
   alleged infringer. It is clear, thus, that for equitable estoppel the alleged
   infringer cannot be unaware – as is possible under laches – of the
   patentee and/or its patent. The alleged infringer also must know or
   reasonably be able to infer that the patentee has known of the former's
   activities for some time. In the most common situation, the patentee
   specifically objects to the activities currently asserted as infringement in
   the suit and then does not follow up for years. In *Dwight & Lloyd
   Sintering v. Greenawalt*, 27 F.2d 823 (1928) Judge Learned Hand noted
   that estoppel was regularly based on 'no further assurance [that a known
   competitor would not be sued than] the patentee's long inaction.' 27 F.2d
   at 827. There is ample subsequent precedent that equitable estoppel may
   arise where, coupled with other factors, a patentee's 'misleading
   conduct' is essentially misleading inaction.

*Aukerman*, 960 F.2d at 1042.

   On its face, the facts appear to be a textbook case of misleading conduct.  In September

2000, Duncan sent Sunrise a letter raising the specter of infringement.  In December 2000,

Duncan wrote a more aggressive letter.  In addition to reiterating the legal consequences of

_____

Court did not address material prejudice.  For the '600, '624, and '807 patents, the Court did not
address reliance or material prejudice.

infringement, Duncan wrote that Sunrise was expressing "an apparent disregard for [the Lautzenhisers'] patent rights" and asked Sunrise to advise him whether it would retain counsel. Sunrise responded on January 2, 2001, seeking the specific Sunrise products of concern. On February 2, 2001, Duncan responded that "all products employing dynamic braking, including 'regenerative' braking, and free wheeling [the subject matter of the '899 and '906 patents] are worthy of examination." In the meantime, PG engaged its own patent attorney, Joe Price, to investigate and respond to the letters. On February 22, 2001, Mr. Price wrote Duncan:

> It has recently come to our attention that there has been an <u>allegation of infringement</u> of the products of certain [PG] clients that incorporate our motor control products. We have been requested to investigate your <u>allegations of infringement</u> . . . [I]t would be helpful if you could correspondingly identify the infringing features that you contend are present in the [PG] control systems for each of your patents. (emphasis added).

It seems clear that at this time, Sunrise and PG thought that LT was gearing up for patent litigation.

Nevertheless, LT failed to respond to Price. Moreover, LT dealt amicably with PG and Sunrise for years in commercial engagements involving the very same products now accused of infringement. Even drawing all reasonable inferences in its favor, LT's conduct was misleading.

### b. Reliance

A party invoking equitable estoppel must also prove reliance. Reliance, while not an element of laches, is essential to equitable estoppel. *Gossen Corp.*, 977 F. Supp. at 1354 (citing *Heckler v. Community Health Services*, 467 U.S. 51, 59-66, 104 S.Ct. 2218, 2223-27, 81 L.Ed.2d 42 (1984)). The Federal Circuit has explained that:

> The accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action.

> Reliance is not the same as prejudice or harm, although frequently confused. An infringer can build a plant being entirely unaware of the patent. As a result of infringement, the infringer may be unable to use the facility. Although harmed, the infringer could not show reliance on the patentee's conduct. To show reliance, the infringer must have had a relationship or communication with the plaintiff which <u>lulls the infringer into a sense of security</u> in going ahead with building the plant.

*Aukerman*, 960 F.2d at 1042-43 (emphasis added).

Defendants allege that LT's conduct lulled them into a false sense of security, thereby giving them confidence that they could engage in costly development projects for motor controllers to be used on Sunrise wheelchairs. According to Defendants, these projects never would have unfolded had LT pursued its infringement claims in a timely fashion. What is more, LT was undoubtedly aware that Defendants were engaging in these commercial activities.

While strong on its face, Defendants' argument is called into doubt by the fact that they may have been actually relying on their belief that LT's '899 and '906 patents were invalid – not their belief that LT had abandoned its infringement claims. Legally, evidence that the alleged infringer believed the patents were invalid or not infringed – whether due to advice of counsel, those within the organization, or others – is evidence that the infringer relied on something other than the patentee's conduct. *See Aqua Queen Manufacturing, Inc*., 93 F.3d at 1558 (reversing summary judgment on equitable estoppel defense because defendant "may have acted due to its belief that the patent was invalid rather than due to any belief that [the patentee] would not sue under the patent."); *Gasser Chair*, 60 F.3d at 776 (no reliance where "[defendant] ignored [patentee's] charges of infringement because [defendant] believed the patent was invalid."); *Troxler Electronic Labs. v. Pine Instrument Co.*, 597 F. Supp. 2d 574, 582 (E.D.N.C. 2009) ("an infringer that merely relies on its own business judgment cannot successfully assert a defense of

equitable estoppel.").

Genuine issues of material fact exist as to whether Sunrise and PG actually relied on LT's action (or inaction), or whether they relied on a belief that the '899 and '906 patents were invalid. An e-mail from PG's President John Camp, suggests that PG believed that these patents were invalidated by prior art: "These historical facts, <u>we believe</u>, demonstrate[] that the claims made in the Lautzenhiser patents had <u>already been invented</u> and were being marketed in the USA and Canada ahead of the patent filing by the Lautzenhisers." (emphasis added). In letters issued by PG Drives on February 16, 2001, under the signature of Stephen Nesmith, who is still with the company, to customers, including Sunrise, PG Drives stated its belief that:

> The technology set forth in the Lautzenhiser patents is not only <u>outdated</u>, it is also not relevant to the modern microprocessor based control systems provided in the [PG] controller products. We at [PG] believe that motor control products are <u>not subject to any legitimate claim</u> based on the Lautzenhiser patents and we intend to support that belief on behalf of our products and customers. (emphasis added).

Further, regarding the Bell letter, Mr. Nesmith, in an email to John Camp copied to Hal Chenhall and forwarded to Mr. Crane, wrote:

> Regarding the 'Lautzenhiser Letter', Hamish stated that Dynamics had received the same panicked calls from their customers, wanting to know the merits of the alleged infringement. Their (Dynamic's/Rosstron's) review of the patents has come to the same conclusion <u>as our own</u>, and they have stated so to their customers (e.g, <u>all aspects of the patents are subject to prior art</u>). Hamish just wanted to know if we read it the same way. I confirmed, that at this time, <u>we are in agreement</u> with their conclusion. (emphasis added).

Finally, Sunrise appears to have relied on the stated position of PG, its "black box" supplier. Mr. Greig's deposition testimony reinforces this possibility. For instance, when asked if Sunrise undertook an infringement analysis following Duncan's late 2000 letters, Mr. Greig responded, "At that time . . .we referred to the makers of those controllers, specifically [PG], for their expert

opinion on how those controllers behaved since we were not knowledgeable."

Defendants characterize these statements as a mere "initial reaction of PG business people . . . including their predictable questioning of patent validity and alleged infringement." They further argue that these reactions were later supplanted by Mr. Price's legal response to Duncan's letter. [Dkt. 187 at 7]. Perhaps, but Defendants' argument is effectively an invitation for the Court to resolve a genuine issue of material fact at the summary judgment stage. Doing so would be inappropriate and premature, particularly given the fact that all reasonable inferences tilt in LT's favor.

If PG and Sunrise relied on assumptions of invalidity rather than LT's conduct, they cannot meet the reliance requirement. Thus, there is a material issue of fact as to whether LT lulled PG and Sunrise into a false sense of security, or whether PG and Sunrise were instead guided by their own legal conclusions. With respect to the equitable estoppel defense for the '899 and '906 patents, PG and Sunrise's Motion for Summary Judgment is **DENIED**.

### 2. The '600, '624, and '807 Patents

The '600, '624, and '807 patents do not require an exhaustive equitable estoppel analysis. Given that Duncan's letter never mentioned these patents – and LT never threatened litigation on these patents prior to the original complaint – genuine issues of material fact exist as to whether or not LT's conduct was misleading. After all, for this element, "Silence alone is not sufficient affirmative conduct to give rise to estoppel," and "silence [must be] sufficiently misleading to amount to bad faith." *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573-74 (Fed. Cir. 1987), *overruled on other grounds*, *Aukerman*, 960 F.2d 1020 (citations omitted). While LT arguably

did more than remain silent,[6] drawing all reasonable inferences in favor of LT, questions of fact surround the allegedly misleading nature of LT's conduct on the '600, '624, and '807 patents. Thus, the Court **DENIES** PG and Sunrise's Motion for Summary Judgment with respect to their equitable estoppel defense on these patents.

### 3. Remaining Issues Raised by LT's Cross-Motion

Two issues raised by LT's Cross-Motion for Summary Judgment remain outstanding.

#### a. Equitable Estoppel and Sunrise Wheelchairs with Delphi Controllers

First, LT argues that it is entitled to summary judgment on Sunrise's equitable estoppel defense to the extent it applies to Sunrise wheelchairs with Delphi controllers. The Court disagrees, finding that genuine issues of material fact exist. First, the fact that Delphi controllers did not come to market until 2005 is not dispositive on Sunrise's equitable estoppel defense: "Equitable estoppel does not require the passage of an unreasonable period of time in filing suit." *Aukerman*, 960 F.2d at 1028. Second, LT's conduct over the course of a ten-year relationship with Sunrise, detailed above, was arguably misleading, potentially lulling Sunrise into a false sense of security so that it could pursue a commercial relationship with Delphi involving controllers without worrying about an infringement suit. On this point, John worked with Sunrise in attempt to ensure that Delphi's controllers were compatible with the head control device. Third, genuine issues of material fact exist as to whether Sunrise relied on LT's conduct in pursuing this commercial relationship with Delphi, and whether this reliance caused material prejudice. Drawing all reasonable inferences in Sunrise's favor, the Court agrees that "the

---

[6] As Defendants' note, "John Lautzenhiser had made Sunrise aware of the '807 and '624 patents . . . when he identified those two patents to Greig in October 1997." [Dkt. 168-1 at 25]. However, this fact alone certainly does not warrant granting summary judgment.

Lautzenhisers' conduct regarding Sunrise powered wheelchairs with Delphi controllers is relevant to . . . Sunrise's reliance on the Lautzenhisers' conduct with regard to the Delphi controller." [Dkt. 172 at 14]. Simply stated, LT cannot prove the nonexistence of an element of Sunrise's equitable estoppel defense. Thus, the Court **DENIES** LT's Cross-Motion for Summary Judgment as to Sunrise's equitable estoppel defense on all patents, to the extent it applies to Sunrise wheelchairs using Delphi controllers.

### b. *Equitable Estoppel & Delphi*

Second, LT argues that Delphi itself cannot prevail under a defense of equitable estoppel. To bolster this claim, LT highlights that Delphi did not release controllers for commercial use until 2005 and Delphi's 30(b)(6) witness testified that prior to developing the controllers, Delphi "had no knowledge of the Lautzenhiser patents during the design phase; so therefore we wouldn't have made any design changes in consideration of the Lautzenhiser patents." Effectively, Delphi admitted that it never based design decisions on LT's action or inaction as to enforcement of the patent-in-suit. This fact eviscerates the element of reliance for purposes of estoppel. Without knowing of LT, Delphi could not have conceivably relied on LT's conduct. *See Troxler Electronic Labs.*, 597 F. Supp. 2d at 594 ("the defense of equitable estoppel requires the court to analyze the facts from the *alleged infringer's perspective*.") (emphasis added). Even drawing all reasonable inferences in favor of Delphi, the Court finds that there are no genuine issues of material fact as to the reliance element of the estoppel defense. LT's Motion for Summary Judgment as it applies to the availability of an estoppel defense for Delphi is therefore **GRANTED**.

### C. Defendants' Implied License/Permissive Use Defense

The parties have brought Cross-Motions for Summary Judgment on Defendants' implied license defense. The doctrine of implied license is anchored in the idea that a patentee cannot consent to an infringer's use or sale of a product, only to later claim infringement based on such use or sale. *Wang Labs v. Mitsubishi Electronics*, 103 F.3d 1571, 1579-80 (Fed. Cir. 1997) ("In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention."). In this context, equitable estoppel and implied license are related. However, "The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an *affirmative grant of consent* or permission to make, use, or sell" while estoppel only requires "misleading conduct." *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 388 (E.D. Tex. 2009) (emphasis added).

Although an affirmative grant of consent is required for implied license, a patentee need not grant a formal license. In fact, "any conduct [by the patentee] exhibited to another from which that other may properly infer that the owner consents to his use of the patent in the making or using it, or selling it, upon which the other acts, constitutes a license." *Wang Labs*, 103 F.3d at 1580; *but see Blais v. United States*, 31 Fed. Cl. 422, 426 (Fed. Cl. 1994) ("[A]n implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party."). In determining the existence of such consent, the Federal Circuit requires:

(1) an existing relationship between the patentee and infringer; (2) within that relationship the patentee transferred a right to use the patented invention;

40

> (3) the right was transferred for valuable consideration; (4) the patentee has now denied the existence of the right; and (5) the patentee's statements and conduct created the impression that it consented to the accused infringer making, using, or selling the patented invention.

*Wang Labs*, 103 F.3d at 1579; *Mass Engineered Design v. Ergotron*, 633 F. Supp. 2d 361, 388 (E.D. Tex. 2009).

Defendants argue that LT actively encouraged Defendants' manufacture, sale, and use of products that it now alleges are infringing, which constitutes an implied license. The centerpiece of Defendants's argument is that Magitek's website advertised its head control device's compatibility with PG controllers.[7] Because of this advertisement, Defendants argue, "[LT] has demonstrated its approval of the right to use products made according to the patents in conjunction with a power wheelchair (such as Sunrise) utilizing a PG controller." [Dkt. 168-1 at 34].

Drawing all reasonable inferences in favor of LT, the Court is not persuaded. At this time, the Court simply cannot find that LT's behavior amounted to an affirmative *grant of consent* as required for an implied license defense. As LT notes, Magitek included instructions to help purchasers of its products install and set up a specialty control for use with a standard controller. In doing so, Magitek informed consumers that its products were compatible with PG controllers. Trumpeting compatibility, however, does not give Defendants *carte blanche* to use patents with impunity. This analysis is further complicated by John's affidavit, which states that Sunrise first contacted Magitek about making their products compatible. If indeed Defendants were the driving force behind this collaborative relationship, then it is harder for Defendants to

---

[7]The head control device could not be used directly with a powered wheelchair. In order to function, the head control device needed to be plugged into a wheelchair controller like PG's.

argue that LT's behavior is the cause of Defendants' alleged infringements. *See Wang Labs*, 103 F.3d at 1580 (noting that Supreme Court precedent holds that under the doctrine of implied license, the conduct of the patentee must lead the alleged infringer to act).

Moreover, the key cases that Defendants rely upon are distinguishable. For instance, in *Mass Engineered*, the court stated that by *selling* Mass products "Dell . . . encouraged [infringing] sales through itself as well as to third parties." *Id*. at 386. Accordingly, the conduct of Dell in selling Mass products created the affirmative grant required for an implied license and related directly to the infringement. In contrast, neither LT nor Magitek ever actually sold Defendants' products; nor has any Defendant sold Magitek products. In *Wang Laboratories*, the court determined that plaintiff, the holder of a patent for a memory module (SIMM), granted an implied license where plaintiff provided designs, suggestions, and samples to defendant, and eventually began purchasing SIMMs from defendant, before making infringement accusations. Here, by contrast, LT was not purchasing allegedly infringing products from Defendants.

While the existence of an implied license is normally a question of law, *Blais*, 31 Fed. Cl. at 425, the Court cannot help but find genuine issues of material fact as to whether or not LT's behavior constituted an affirmative grant of consent. *See Wang Laboratories*, 103 F.3d at 1579 (noting that there is a factual component to the implied license review). LT argues, "None of the contacts by and between LT, [PG] and Sunrise was coupled with any affirmative statements or conduct on the part of LT giving Sunrise or [PG] carte blanche permission to manufacture devices which infringed one or more of the five Lautzenhiser patents at issue in this action." [Dkt. 182 at 10]. The Court believes that genuine issues of material fact exist on this very issue.

On the flip side of the coin, the Court also finds that genuine issues of material fact

preclude summary judgment for LT.  Drawing all reasonable inferences in favor of Defendants, the Court simply cannot find that LT has proven the nonexistence of any of the five elements articulated above.  Elements (1) and (4) are clearly met, while questions of fact cloud elements (2), (3), and (5).  For these reasons, the parties' Cross-Motions for Summary Judgment on the Defendants' implied license defense are **DENIED.**

## IV. CONCLUSION

For the reasons set out above, the Court **GRANTS** PG and Sunrise's Motion for Summary Judgment [**Dkt. 154**] as to the laches defense on the '899 and '906 patents.  Thus, for these patents, LT cannot recover damages before the filing date of the suit: Sunrise was sued on June 18, 2007, and PG was named as a co-Defendant on July 11, 2008.  Because of the existence of genuine issues of material fact, the Court **DENIES** PG and Sunrise's Motion for Summary Judgment as to the laches defense on the '807, '624, and '600 patents.  The Court did not assess Delphi's laches defense because, for the reasons explained above, it is a moot point.  In making these determination, the Court also **DENIES** LT's Cross-Motion for Partial Summary Judgment [**Dkt. 158**] as to the availability of the laches defense for Sunrise wheelchairs that use Delphi controllers.

As to the equitable estoppel defense, the Court **DENIES** Defendants' Motion for Summary Judgment for all patents-in-suit.  Moreover, because of the existence of genuine issues of material fact, the Court **DENIES** LT's Cross-Motion for Partial Summary Judgment as to the availability of the equitable estoppel defense for Sunrise wheelchairs with use Delphi controllers.  However, the Court **GRANTS** LT's Cross-Motion for Partial Summary Judgment as to the

availability of the equitable estoppel defense for Delphi itself. Thus, Delphi cannot prevail under a theory of equitable estoppel.

Finally, as to the implied license defense, the Court **DENIES** the parties' respective Motions for Summary Judgment.

SO ORDERED: 11/08/2010

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Lee Scott Archer**
VALENTI HANLEY &
ROBINSON, PLLC
larcher@vhrlaw.com

**Alex P. Brackett**
MIDDLETON & REUTLINGER
abrackett@middreut.com

**Kevin Todd Duncan**
VALENTI, HANLEY &
ROBINSON, PLLC
kduncan@vhrlaw.com,kduncan2019
4@yahoo.com

**Glenn Eric Forbis**
RADER, FISHMAN & GRAUER PLLC
gef@raderfishman.com,litigationpar
alegals@raderfishman.com

**Ted C. Gillespie**
MACMILLAN, SOBANSKI &
TODD LLC
gillespie@mstfirm.com

**Augustus S. Herbert**
MIDDLETON REUTLINGER
aherbert@middreut.com,cniemeier@
middreut.com

**James R. Higgins**
MIDDLETON & REUTLINGER
jhiggins@middreut.com,cniemeier@
middreut.com

**Linda D. Kennedy**
RADER FISHMAN & GRAUER PLLC
ldk@raderfishman.com,litigationpar
alegals@raderfishman.com

**James E. Milliman**
MIDDLETON REUTLINGER
jmilliman@middreut.com

**Michael W. Oyler**
REED WEITKAMP SCHELL &
VICE PLLC
moyler@rwsvlaw.com

**John S. Reed**
REED WEITKAMP SCHELL &
VICE PLLC
jreed@rwsvlaw.com,kchilders@rws
vlaw.com

**Theodore T. Storer**
ROTHBERG, LOGAN & WARSCO
LLP
tstorer@rlwlawfirm.com,nmonnier@
rlwlawfirm.com

**Robert B. Thornburg**
FROST BROWN TODD LLC
rthornburg@fbtlaw.com,lselan@fbtl
aw.com

**Joel E. Tragesser**
FROST BROWN TODD LLC
jtragesser@fbtlaw.com,saddington@
fbtlaw.com

**Michael A. Valenti**
VALENTI HANLEY &
ROBINSON PLLC
mvalenti@vhrlaw.com